HORACE DAY CO. v. UNITED STATES (No. 249). LAMONT, CORLISS & UNITED STATES (No. 250).[2]

REAPPRAISEMENT OF SWISS CHOCOLATE.

There is no contention that the reappraisement board was without jurisdiction, that it was guilty of fraud, or that it added independent items not dutiable to make the appraised value. The board had before it evidence as to the course of business of manufacturers and customers where the chocolate was handled in Switzerland and at the time this was exported. That evidence related both to the quantities and prices of the commodity in business transactions in Switzerland and it can not accordingly be held that the board's finding was based wholly upon the "conventional agreement" by which it had been sought to control the sale of chocolate in that country. Neither the Board of General Appraisers sitting as a classification board nor this court has authority on the record in this case to review the appraisement as made.—Wolff v. United States (1 Ct. Cust. Appls., 181; T. D. 31217).

## United States Court of Customs Appeals, April 17, 1912.

APPEAL from Board of United States General Appraisers, Abstracts 23334 and 23355 (T. D. 30645).

[Affirmed.]

*B. A. Levett* (*Arthur M. King* of counsel) for appellants.

*William K. Payne*, Deputy Assistant Attorney General (*William A. Robertson*, special attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

These cases relate to milk chocolate imported from Switzerland between April, 1907, and February, 1908, at the port of New York.

---

[1] Reported in T. D. 32387 (22 Treas. Dec., 593.)

[2] Reported in T. D. 32456 (22 Treas. Dec., 713).

There were numerous importations and protests, but it is agreed that the issues in all of the protests and the two cases are the same, and they were heard together.

At the time these importations were made there was extant an agreement between certain manufacturers of milk chocolate in Switzerland, which in the record is referred to as "the conventional treaty." We insert here so much thereof as is claimed to be applicable to the issues in these cases:

Perceiving the necessity to stop in their industry reasonableness of prices incompatible with the actual situation of the market of raw materials and referring, besides, to the affixed protocol of the assembly general of January 16, 1907, the signers have unanimously resolved and established the convention as follows:

#### First article.

(a) The contractors engage themselves, one toward the other, and during the whole period of the convention, not to sell nor to invoice to anybody their produce on the basis of cacao under the minimum sales prices stated below nor to grant more favorable conditions of discount and reduction than those fixed below, even if the merchandise was to be delivered at a date posterior to that of the validity of the convention.

 \*  \*  \*  \*  \*  \*  \*

|  | Francs. |
|---|---|
| (h) For flats of under 100 gr | 3.20 |
| (i) Minimum price for milk chocolates: In flats | 3.20 |

 \*  \*  \*  \*  \*  \*  \*

#### Second article.

(a) The merchandise sold and invoiced at the common tariff are payable at 90 days net or with 3 per cent discount at 30 days after date of invoice.

(b) Each contracting firm is authorized to compensate to its customers on the total amount of business which it will have made during the commercial year a proportional discount corresponding to the following scale:

|  | Francs. |
|---|---|
| 2 per cent for a yearly amount of sales of | 300 |
| 3 " " " " " " " " " | 500 |
| 4 " " " " " " " " " | 1,000 |
| 4½ " " " " " " " " " | 2,000 |
| 5 " " " " " " " " " | 3,000 |
| 5½ " " " " " " " " " | 6,000 |
| 6 " " " " " " " " " | 12,000 |
| 6½ " " " " " " " " " | 25,000 |

If the annual sales amount exceeds 25,000, the degree of the discount is to the manufacturers' liking, up to and including the maximum possible degree of discount, which is 8 per cent.

 \*  \*  \*  \*  \*  \*  \*

The merchandise can be addressed f. o. b. destination, directly to each member of the association, but it can not be shipped f. o. b. destination to the customers of the wholesalers.

All the compensations of the discounts must be credited not before the three months following the closure of the commercial year to which these compensations relate. Besides, these compensations can not be made in cash, but must be credited to the account of the customer on account of future purchases. This rule can only be broken in case of succession or discontinuance of business.

(c) Each contracting house is equally authorized to compensate to its customers on the amount of each invoice a direct discount of 3 per cent (three per cent), excluding

any other reductions except the conventional discount. But, if each contracting firm has the right to apply to its customers either one of the discounting systems mentioned above, it is agreed that both systems can not be used successively with one customer during the same commercial year, and at the beginning of it the contracting factory must make an agreement with each customer with one of the two systems to be brought into effect with him, without possibility of a change during this period.

Furthermore, it is absolutely agreed and each contracting house shall be obliged to advise its customers at the beginning of the year that the obtaining of the compensation of discounts is subordinate to the express condition that the customer has not purchased other produces with basis of cocoa, of Swiss origin, than those manufactured by the houses adherent to the conventional treaty, during the period of calculation of the discount.

*    *    *    *    *    *    *

*Ninth article.*

All the engagements of the present convention are valid only for the Swiss territory; they do not apply either to the "zone franche de Savoie" or to the "pays de Gex," or to the other foreign countries.

There are stringent provisions in this treaty and a protocol thereto, not necessary to insert here, tending to enforce adherence to the treaty on the part of the contracting parties and designed to impose severe penalties upon them for violations thereof.

Lamont, Corliss & Co. are the only persons in the United States to whom the chocolate products manufactured by Societe Generale Suisse de Chocolats will be sold, and Horace L. Day Co. sustain the same relation to Suchard. Both of these manufacturers are parties to said conventional treaty. The importers are not parties thereto.

Under the provisions of section 13 of the customs administrative act of 1890, a reappraisement was ordered at the request of the importers, which was made by Somerville, general appraiser. The testimony before him mainly consisted of a number of extracts from letters between the shippers and the importers, certain invoices showing sales of small quantities of chocolate in Switzerland with discounts allowed thereon, and the conventional treaty before mentioned.

The general appraiser confirmed the action of the local appraiser and held among other things that the usual wholesale quantities of the merchandise as bought and sold in the markets of Switzerland for a year was in value from 1,000 to 25,000 francs; that under the conventional agreement there were two discounts, classifying them with reference to such agreement and said that the importers claimed to be entitled to the maximum discount because they buy in extraordinary quantities of not less than 400,000 francs in value; that one object in allowing discounts was to put all purchasers upon terms of equality where practicable; that the allowance of the sliding scale discount was coupled with the most extraordinary and stringent conditions, the failure to comply with which deprived the purchasers of the privilege of obtaining it. He closes his opinion by saying that—

For the reasons stated, and others that might be assigned, the appraised value is sustained.

The importers appealed to reappraisement and were duly heard thereon by Board No. 1, which granted an open hearing. Several witnesses were thereupon called on behalf of the importers, and the Government called the local appraiser and also introduced the report of Carl Kaufmann, a confidential agent of the Government, which report is of record. The evidence considered by the general appraiser was also submitted to the reappraisement board.

The material part of the opinion of the reappraisement board is as follows. After referring to the first article of the conventional treaty the board says:

It is admitted on all sides that the gross price at which the grade of chocolate involved is to be sold in Switzerland under the convention agreement is 3.20 francs per kilo; but from this price certain discounts are allowable, and the pending controversy as to foreign market value arises out of the question of what discounts are properly deductible from the 3.20 francs per kilo price.

By the said convention agreement two systems of discounts are provided under the provisions of Article II of said agreement. Under subdivision C thereof we think it is the unquestioned intent that all purchasers may be allowed an immediate discount of 3 per cent; and that under subdivision A a further discount of 3 per cent may be allowed. The other or alternative system of discounts is provided for in subdivision B as follows:

Here are inserted the material portions of Article II which we have already quoted. The decision then proceeds as follows:

Reference to subdivision C shows that no party to the agreement may give to its customers the benefit of more than one of the systems of discount set forth; and that at the beginning of the commercial year the customer must elect which one of the systems of discount shall be applied to his purchases, and that after such election is made no change thereof can be allowed during the commercial year.

Appellants have sought to establish that the scale of discounts fixed by said agreement applies only for consumption in Switzerland and is of no effect in regular transactions between the parties to said agreement and purchasers of their respective chocolates for export to foreign countries, but we think the first article of said agreement which we have quoted justifies the contrary understanding. In other words, the parties to the agreement are bound not to sell nor to invoice to *anybody* their products below the minimum sale price fixed by the convention; and therefore if the agreement thus entered into is to be considered as being of binding force in any particular mentioned therein upon the parties to it, it is as binding, so far as the prices are concerned, in sales of chocolates for export to the United States as upon chocolates sold for consumption in Switzerland.

From the invoice prices a deduction of 15 per cent discount has been made. This makes the net invoice price equal to 3.20 francs per kilo, less 9 and 3 per cent discount. The value fixed by the appraiser, it appears, is on the basis of 3.20 francs per kilo, less 3 and 3 per cent discount. This action of the local appraiser was affirmed by the general appraiser, and we think upon the evidence before us that that conclusion, so far as it relates to discounts, should be affirmed, for the following reasons:

First. Under the convention agreement there is only one fixed and determined discount upon sales for cash; namely, 3 and 3 per cent discount.

Second. The graded discounts provided for in subdivision B of Article II are not such regulated and fixed trade discounts upon current transactions as may be taken into consideration and allowed in fixing and determining the foreign market value of merchandise. The various rates mentioned in subdivision B are based not upon current sales, but upon the aggregate of sales covering a period of 12 months. Neither is

there any actual payment of such discounts when earned at the end of the 12 months. In order to be entitled to the benefit of any one of such discounts it is not only necessary that the aggregate of the purchases of a customer for a year must be such as to entitle him thereto, but he must continue as a customer beyond a period of 12 months in order to get the benefit of such discount. That is to say, such discount, having been earned, is not payable in cash as discounts usually are, but is to be credited on the purchases of the customer made during the succeeding year.

Another feature of the case presented is that which seeks to establish that there is no wholesale market in Switzerland for these chocolates, and to that end evidence has been presented showing a large number of small sales direct from the manufacturers to dealers, and it may be conceded that as conditions have existed since the convention agreement the great majority of sales by manufacturers have been made direct to retailers. This condition, however, if not actually forced by has been in large measure the result of the work of the convention. This conclusion is warranted we think by the following language contained in subdivision B of Article II, already quoted, namely:

"*Obs.* The merchandise may be sent paid direct to each member of the association, whilst it can not be sent direct to the customers of the wholesalers."

We agree with the action of the general appraiser so far as the reappraised value was determined upon the basis of discounts, but the element of freight for inland transportation seems to have been overlooked.

It is apparent under the convention agreement that to all purchasers direct from parties thereto chocolates are delivered in any part of Switzerland free of charge for transportation, and we therefore conclude that in addition to the allowance of 3 per cent and 3 per cent discount there should be an allowance of 2 per cent for transportation, and the value thus found is exclusive of the cost of outer coverings.

Liquidation was had accordingly subject to the importers' protests which were later and duly heard by the Board of General Appraisers. The board in its opinion, among other things, said:

A classification board of the Board of General Appraisers, like the courts, in such a proceeding as that now before us, can examine the evidence that was before the reappraisement board, not for the purpose of determining its admissibility or weighing it to determine its preponderance, but only for the purpose of ascertaining and determining whether or not there was any evidence upon which the reappraisement board based its finding.

\*        \*        \*        \*        \*        \*        \*

The contentions of the importers as stated in their brief are as follows:

I. There was no evidence before the Board of General Appraisers to warrant their finding.

II. Even if the conventional agreement can be considered as evidence of the market value of this chocolate, the appraising officers erred in the construction they put upon that document.

III. The record shows that the goods in question are sold in wholesale quantities for export only and that the sales in the home market are in such limited quantities that the market value can not be based upon them.

The second and third of these we think in this case are essentially embraced in the first. As to the third, under the facts of this case, the question as to whether or not the domestic sales of chocolate in Switzerland were of such quantities as to constitute a home market value is one, we think, for the reappraisement board to determine. There is certainly some testimony of sales in wholesale quantities in Switzerland for domestic consumption, and the sufficiency and weight of this testimony was for that board, and not for this, to decide. The question as to the meaning of the convention agreement was, under the facts of this case, also for that board and not for this.

\*        \*        \*        \*        \*        \*        \*

The convention or agreement referred to must be read and interpreted in the light of the other evidence submitted in the case. To do that necessarily involves weighing all of the evidence, and this is a function peculiarly that of the board of reappraisement. An examination of the entire record in the case convinces us that there was some evidence before the board of reappraisement tending to establish the market value of the commodity in question as found by them. The protests are therefore overruled.

The evidence establishes that the net price of the chocolate to the importers is 15 per cent less than the gross price thereof as shown by the invoices, and the importers claim that this net price is controlling upon the value of the merchandise for the purposes of appraisement, because they say that the record nowhere establishes that the merchandise is sold in wholesale quantities in Switzerland, and therefore no wholesale price can be ascertained or fixed in this case other than the net price at which they purchased the chocolate.

Section 19 of the customs administrative act of 1890 provides that when imported merchandise is subject "to an ad valorem duty or to a duty based upon or regulated in any manner by the value thereof the duty shall be assessed upon the actual market value or wholesale price of such merchandise as bought and sold in usual wholesale quantities at the time of exportation to the United States in the principal markets of the country from whence imported and in the condition in which such merchandise is there bought and sold for exportation to the United States or consigned to the United States for sale."

The importers rely, among other things, upon a regulation of the Treasury Department made June 1, 1907, in relation to a commercial agreement then in force between the German Government and the United States, the material part of which is as follows (T. D. 28215):

Market value, as defined by section 19 of the customs administrative act, shall be construed to mean the export price whenever goods, wares, and merchandise are sold wholly for export, or sold in the home market only in limited quantities, by reason of which facts there can not be established a market value based upon the sale of such goods, wares, and merchandise in usual wholesale quantities, packed ready for shipment to the United States.

It appears that this construction of the section of the act was approved by the Board of General Appraisers in T. D. 28382, and by the Circuit Court for the Southern District of New York in United States *v.* Haviland (167 Fed. Rep., 414), the judgment in which case was affirmed in 177 Federal Reporter, 175.

We do not understand that this rule of construction is controverted by the Government.

The invoice price of the merchandise was 3.20 francs per kilo, and it was entered at that value, less 15 per cent discount. The appraiser refused to allow this discount but did allow two discounts of 3 per cent each, which resulted in an advance of the entered value of the merchandise.

The reappraisement board had before it whatever was considered by the general appraiser and the report of the confidential agent, Kaufmann, of which report we quote the material parts:

1. Sales of wholesale *quantities* of chocolate are made in Switzerland with a discount of 3 per cent and 3 per cent for cash at the time of purchase.

2. An annual turnover of francs 3,000 with *one* Swiss dealer is here regarded as a wholesale quantity.

3. Chocolate is sent to the Swiss buyer in Switzerland carriage paid when the merchandise is sent by rail.

To the above I can add further explanatory remarks.

ad. 1. The buyer prefers, however, in most cases, to get 3 per cent discount for cash, and, in addition, at the end of the year, the sale bonus of 2 per cent to 8 per cent on a yearly consumption of francs 300 to francs 25,000 (instead of the 3 per cent and 3 per cent).

ad. 2. A yearly sale of francs 3,000 is to be regarded as a wholesale quantity, this already entitling the buyer to a sale bonus of 5 per cent. Whoever, therefore, attains a quantity of francs 3,000 buys his merchandise with 3 per cent discounts and 5 per cent annual bonus—8 per cent total on the price paid.

\*        \*        \*        \*    -    \*        \*        \*

As I have already reported, there are no wholesale dealers of chocolate in Switzerland. The chocolate manufacturers having, by dint of great sacrifices and doggedness, driven the foreign competition out of the country (1906: import value, francs 61,530, against francs 34,192,585 export) by selling, for years, dirt cheap, they organized themselves into a syndicate. With the same energy which had enabled them to kill the foreign competition they set themselves the task, and succeeded, in placing their production for the inland consumption direct with the retail trade—confectioners, retail shops, hotels, grocery cooperative stores—thereby eliminating completely the wholesale(r), the middleman. In this way they got "the weapon in their own hands," and could slowly raise the prices for Switzerland, putting the profits of wholesaler and middleman into their own pockets.

Thus, while the Swiss consumer, having throttled the wholesaler, must pay legal prices, the chocolate manufacturer exports these products, especially to England, much cheaper; of course, only to the wholesalers.

The reappraisement board also had before them the testimony of several witnesses, most of whom were introduced on behalf of the importers. Without attempting to quote the same it appears therefrom that witnesses testified that a usual wholesale quantity of chocolate in Switzerland would be to the amount of 25,000 francs, or $5,000 annually, although one of the witnesses said it was hard to say what was a wholesale quantity because the quantities varied; that importers Day Co. ordered about every month, sometimes twice a month, in amounts of from $1,000 to $15,000; that Corliss & Co. purchased in shipments of from very small amounts to $15,000 or $20,000, with a total annual business of about $500,000; that some of the manufacturers, parties to the conventional agreement, sold their products to customers in various foreign countries, sometimes by the carload; that the price per carload would run from about $2,000 to $2,500, depending upon the size of the cars; that in sales to some countries other than the United States there was no sliding scale of discounts, but discounts allowed were direct; that there were different arrangements with customers in different countries and

different discounts allowed; that a discount of 3 per cent and 3 per cent was not an unusual method of discount in Switzerland; that the conventional agreement in a general way states the method of business in the chocolate trade in Switzerland, and the general methods of discounts as applied to purchases of goods in Switzerland.

The witnesses gave much other testimony, some of which tended to support the claim of the importers, that there were no sales of wholesale quantities in Switzerland, and that the discounts allowed on merchandise sold to customers in foreign countries were usually more than 3 per cent and 3 per cent.

The importers' objections to the reappraisement, as stated in their brief and relied upon here, are:

1. That chocolate of the kind in question is not sold for home consumption in Switzerland in such quantities that the market value can be ascertained, so that under section 19 of the administrative act the export price must be taken for dutiable purposes.

2. That there was no evidence before the appraising officers to warrant the finding of the market value as returned by them.

3. That if the conventional agreement referred to and on which the appraising officers based their decision can be considered as evidence of the market value of the chocolate, the appraising officers erred in their construction of that document.

These objections rest upon the premise that the appraisement and reappraisement were wholly based upon the conventional agreement.

As indicating the rules applicable in cases of this character, we repeat here what was held in Wolff *v.* United States (1 Ct. Cust. Appls., 181; T. D. 31217), where the court, speaking by Smith, judge, said:

Appraisements have been reviewed where the appraisers were disqualified from acting, *and therefore had no power, authority, or jurisdiction to make them.*

They have been set aside by the courts when the appraisers have not examined or seen the goods which the law required them to examine or appraise and had therefore *failed to acquire in the manner prescribed by statute jurisdiction of the subject matter.*

They have been declared invalid by judicial tribunals where the appraisers, after finding market value and wholesale price, have, independent of such value, added on items which it was not their function, but that of the collector, to determine and from the finding of which by the collector *an appeal to the courts is expressly allowed.*

Appraisements may also be impeached for fraud on the part of the appraisers. Passavant *v.* United States (148 U. S., 214); Earnshaw *v.* United States (146 U. S., 60).

The decision of a reappraisement board on the question of the *dutiable value* of merchandise can not, however, be reviewed in any court under the provisions of section 15 of the customs administrative act. Passavant *v.* United States, *supra.*

In the case before us the invoice price of the merchandise is above the entered value and as advanced the appraised value is less than such invoice price. The advance in entered value occurs because the appraising officers declined to adopt the importers' claim that the invoice price should be reduced to correspond to the net amount which the importers paid for the merchandise; that is, they have allowed a smaller discount from the invoice price than the importers claim.

It is not claimed that the reappraisement board was guilty of fraud; that it was without jurisdiction in the premises; or, that it added independent items not dutiable to make the appraised value.

Reduced to its last analysis the importers' claim is that there was no evidence showing either sales in wholesale quantities of the imported merchandise in Switzerland at the time of exportation or the wholesale or market value there of such merchandise.

It is manifest that the board had before it evidence as to the course of business of manufacturers and customers in handling the merchandise in Switzerland at the time the goods here involved were exported therefrom, relating both to the quantities and prices of the commodity in business transactions there, and we think it can not be said that its finding was based wholly upon the conventional agreement.

It will be presumed, and is not questioned, that it had before it the requisite samples of the importations and it will also be presumed that the members of the board exercised their judgment and discretion in making the appraisement.

Now, section 10 of the customs administrative act of 1890 provides that appraising officers shall by all reasonable ways and means in their power ascertain, estimate, and appraise the actual market value or wholesale price of the merchandise at the time of exportation in the principal markets of the country from whence it is imported, and when ascertained it becomes the appraised value upon which duty is assessed under section 19 of the same act.

For the purposes of appraisement the law does not contemplate that there can be two wholesale prices or two wholesale market values. United States v. Passavant (169 U. S., 16).

The determination of the appraisement board as to what place in the country of exportation is the principal market is final. Stair v. Peaslee (59 U. S., 521).

In the absence of fraud it is not competent to inquire whether the board has followed or disregarded the evidence so far as the question of value is concerned, or whether it has received incompetent evidence, or rejected evidence that was competent, or to inquire how the various elements impressed the board, or what grounds influenced or controlled the mental processes of the members thereof. Hilton v. Merritt (110 U. S., 97); Auffmordt v. Hedden (137 U. S., 310); United States v. Passavant (169 U. S., 16); Chicago, B. & Q. Ry. Co. v. Babcock (204 U. S., 585); Wolff v. United States, supra.

It is their right and duty to use their own judgment and knowledge in connection with such evidence as is before them in making the appraisement. Bartlett v. Kane (57 U. S., 272); Belcher v. Linn (65 U. S., 508).

In the case at bar the board has concurred with the general appraiser, Somerville, in his determination as to the market value or wholesale price of the merchandise as bought and sold in usual wholesale quantities in Switzerland at the time of exportation, except that it has made a further reduction of 2 per cent.

This stands as its appraisement, and we hold that neither the Board of General Appraisers, sitting as a classification board, nor this court have authority under the record in this case to review the same.

The opinion of the reappraisement board is not absolutely clear as to whether it took the market value or wholesale price of the merchandise in Switzerland at the time of its exportation or adopted what it found to be the export price thereof pursuant to the regulation embodied in T. D. 28215, already quoted, which concededly it might have done.

In whichever of the two ways this price was fixed the result is the same, and it was a question upon which its finding is not the subject of review within the rules hereinbefore set forth.

As already observed, this is not a case where the appraisers have, after ascertaining the market value, proceeded to add thereto independent items to make dutiable value, which course the Supreme Court has characterized as an adoption of a wrong principle contrary to law, and has held would justify the impeachment of such an appraisal. United States *v.* Passavant (169 U. S., 16); Robertson *v.* Frank (132 U. S., 17).

If the case were one, if there be such, that warranted the inquiry as to whether or not there is some evidence of wholesale market value to be found in the record to sustain the reappraisement, we think it must, nevertheless, be upheld.

The importers have expressly abandoned their claim as to the incorrectness of the collector's liquidation.

The judgment of the Board of General Appraisers is *affirmed.*

DE VRIES, Judge, was disqualified, and did not sit.