The judgment of the United States Customs Court is *reversed*.

UNITED STATES *v.* M. MINKUS (No. 3626)[1]

---

[1] T. D. 46912.

United States Court of Customs and Patent Appeals, January 29, 1934

*Charles D. Lawrence,* Assistant Attorney General (*John F. Kavanagh,* special attorney, of counsel), for the United States.

*Puckhafer & Rode* (*George J. Puckhafer* of counsel) for appellee.

[Oral argument October 13, 1934, by Mr. Lawrence and Mr. Puckhafer]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, First Division, in reappraisement 95857–A.

The imported merchandise consists of miniature dictionaries. It was entered at a value of approximately one German mark each, less a discount of 75 per centum, and was appraised at one German mark each, less a discount of 60 per centum.

The importer appealed to reappraisement.

The record consists of an affidavit by one Carl Wilhelm Gunther, manufacturer and exporter of the involved dictionaries, the manufacturer's price list, and three reports submitted by special agents of the Government.

The information contained in the price list is not inconsistent with the affidavit of Gunther, which, due to its importance, we quote:

I, Carl Wilhelm Gunther, being duly sworn, deposes and says: I am owner of Heinrich Schmidt and Carl Gunther, manufacturers and sellers of Liliput Dictionaries to M. Minkus, of New York. I am familiar with the prices paid by M. Minkus for such goods and depose and say that the prices actually appearing upon the consular invoices, certified to before the consul at Leipzig, are in fact the actual prices paid by M. Minkus for such goods. This merchandise is also sold by my company in Germany for use in the home market, and also for export

to Italy, Switzerland, France, Spain, South America, and other countries. The prices received by my company in the German market depend upon the quantity purchased. The basic price per book is one German mark, subject to discounts varying from 33⅓% to 75%, to wit:

A discount of 33⅓% for quantities less than 25.
A discount of 40% for quantities of 25 or more.
A discount of 45% for quantities of 50 or more.
A discount of 50% for quantities of 100 or more.
A discount of 60% for quantities of 500 or more.
A discount of 66⅔% for quantities of 1,000 or more
A discount of 70% for quantities of 5,000 or more.
A discount of 75% for quantities of 10,000 or more.

These goods are freely offered for sale to all purchasers in the ordinary course of trade. The principal market in Germany for this class of goods is Leipzig, and our merchandise can be purchased by anyone at the price of one German mark each, less the discount for quantity as indicated. We also sell merchandise in Leipzig for export to Italy, Switzerland, France, and other countries at a price in the foreign currency which is equivalent to the price at which our goods are freely offered for sale in the German market. For example, we sell to Italy at a price of 1.20 lire, to Switzerland at a price of —.30 francs, to France at a price of 1.60 francs, which is equivalent to the price of one mark, less 75%.

It is natural that for small quantities, due to the extra expense of handling, bookkeeping, etc., we must charge more than we receive when we sell in wholesale quantities. I am familiar with the varying quantities which are sold by my company, and I affirm that the bulk of our business in the Liliput Dictionaries is sold at a price of one mark, less 75% discount. This condition has prevailed for the past four years. I attach hereto a copy of a circular of our Liliput Dictionaries, which has been circulated throughout the trade for a long time, and which bears the prices and discounts. I also attach copy of invoice showing the sale of goods, the same as those shipped to M. Minkus, which we sold to F. W. Woolworth Company of New York.

This company has been ready and willing to sell to any and all purchasers Liliput Dictionaries, the same as those shipped to M. Minkus, at the prices and discounts shown on the circular, hereto attached.

The special agents' reports contain statements to the effect that the merchandise is freely offered for sale in the principal markets of Germany to all purchasers at the basic price of one German mark, less varying discounts, depending upon the quantities purchased, as stated in the quoted affidavit.

On this record the court below affirmed the judgment of the trial court holding that the entered value, approximately one German mark, less a discount of 75 per centum, was the foreign value of the merchandise, and that "there was not an export value higher than the foreign value on the date of shipment."

In its decision, the Appellate Division of the Customs Court quoted at length from the affidavit of Mr. Gunther, and evidently based its decision upon the information contained therein.

It appears from the affidavit that identical goods were freely offered for sale for consumption in Germany, and for export to Italy, Switzer-

land, France, Spain, South America, and other countries, to all purchasers, and actually sold at the basic price of one German mark per book, less discounts varying from 33⅓ per centum to 75 per centum, depending upon the quantities purchased.

Mr. Gunther further stated in his affidavit that it was "natural that for smaller quantities, due to the extra expense of handling, bookkeeping, etc., *we must charge more than we receive when we sell in wholesale quantities.*" (Italics ours.)

We are not clear as to the information intended to be conveyed by the foregoing statement. Did the witness mean that he did not consider quantities of less than 25, or less than 50, or less than 100, or less than 500, or less than 1,000, or less than 5,000, or less than 10,000 books, wholesale quantities? Of course, if there was any substantial evidence in the record to sustain the proposition that all sales of less than 10,000 books were not sales in wholesale quantities, in view of the prices paid for quantities of 10,000 or more, the determination of the issues would not be difficult. However, such a conclusion is entirely out of harmony not only with other portions of the affidavit, and the manufacturer's price list, but also with the reports of the Government's special agents. It is fair to say that such a construction of the quoted language has not been suggested by either of the courts below in their decisions, nor by counsel for appellee. We have referred to the matter solely because the quoted statement immediately precedes the following statement in the affidavit, which we consider of vital importance in a proper determination of the issues: "I am familiar with the varying quantities which are sold by my company, and I affirm that the *bulk of our business* in the Liliput Dictionaries is sold at a price of one mark, less 75% discount." (Italics ours.) From this statement, we think it is apparent that he meant that the major portion of their dictionaries were sold at a price of one German mark, less a discount of 75 per centum. This is not the equivalent of saying that the "major portion of the sales or offers for sale" were at the basic price of one German mark, less a discount of 75 per centum, nor have we been able to find any evidence of record to that effect.

For all that appears of record, the major portion of the manufacturer's dictionaries may have been sold to three or four purchasers, in wholesale quantities of 10,000 or more, at the basic price of one German mark, less a discount of 75 per centum; whereas, the rest of its dictionaries may have been sold in wholesale quantities to hundreds of buyers, at the basic price of one German mark, less discounts varying from 33⅓ per centum to 70 per centum, depending upon the quantities purchased.

In the case of *United States* v. *Passavant*, 169 U.S. 16, the Supreme Court considered the following language contained in section 19 of

the customs administrative act of June 10, 1890, which we quote from the court's decision:

that whenever imported merchandise is subject to an ad valorem rate of duty, or to a duty based upon or regulated in any manner by the value thereof, the duty shall be assessed upon the actual market value or wholesale price of such merchandise as bought and sold *in usual wholesale quantities*, at the time of exportation to the United States, in the principal markets of the country from whence imported, and in the condition in which such merchandise is there bought and sold for exportation to the United States, or consigned to the United States for sale, including the value of all cartons, cases, crates, boxes, sacks, and coverings of any kind, and all other costs, charges and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, * * * (Italics ours.)

and, with reference thereto, and to the duties of the appraiser, said:

What was to be ascertained was the actual market value or wholesale price of the merchandise as bought and sold in usual wholesale quantities at the time of exportation, in the principal markets of the country from whence imported. This market value or price was the price in Germany and not the price after leaving that country, *and the act does not contemplate two prices or two market values.* (Italics ours.)

In the case of *Horace Day Co.* v. *United States,* 3 Ct. Cust. Appls. 152, T.D. 32456, this court also had under consideration section 19 of the customs administrative act of June 10, 1890.   We quote from that decision:

For the purposes of appraisement the law does not contemplate that there can be two wholesale prices or two wholesale market values.   United States *v.* Passavant (169 U.S., 16).

In the case of *Keve & Young* v. *United States,* 11 Ct. Cust. Appls. 94, T.D. 38747, this court held that paragraph R of section III of the Tariff Act of 1913, which read:

PAR. R.   That whenever imported merchandise is subject to an ad valorem rate of duty, or to a duty based upon or regulated in any manner by the value thereof, the duty shall be assessed upon the actual market value or wholesale price thereof, at the time of exportation to the United States, in the principal markets of the country from whence exported; that such *actual market value* shall be held to be the price at which such merchandise is freely offered for sale to all purchasers in said markets, in the *usual wholesale quantities,* and the price which the seller, shipper, or owner would have received, and was willing to receive, for such merchandise when *sold in the ordinary course of trade in the usual wholesale quantities,* including the value of all cartons, * * * containers or coverings, * * * and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, * * * (Italics ours.)

did "not contemplate two market values."   The precise language of the court is as follows:

That definition in express terms defines *actual market value,* not wholesale price, and does not contemplate two market values; and the United States Supreme Court so held in United States *v.* Passavant (169 U.S., 16, at p. 22).

* * * * * * *

Congress knew just as did the business world that either because of slack demand or exemption from domestic taxes export goods were not infrequently sold for less than the price they commanded in the retail market, and that therefore values could not be safely measured by export prices. It knew that retail prices were not readily ascertainable because of the multitude of retail markets and of the difference in retail prices caused by local conditions. It knew that wholesale prices in the foreign market had a decided advantage over both export prices and retail prices, over the former in that they were steadier and a fairer index of true market value and over the latter, inasmuch as they were more uniform and more readily ascertainable.

And, knowing all that, Congress in paragraph R defined actual market value to be the price at which merchandise was offered not to all purchasers, but to all purchasers *in the usual* wholesale quantities and the price which the seller, shipper, or owner would have received and was willing to receive for his merchandise *when sold in the ordinary course of trade in the usual wholesale quantities.*

Customs experience had shown, and Congress was fully informed, that certain kinds of goods were not sold in the country of export in wholesale quantities. Accordingly, it was prescribed in paragraph L that that class of merchandise should be appraised at not less than the cost of production when the actual market value thereof, *as defined by law*, could not be ascertained to the satisfaction of appraising officers. As an additional precaution it was further provided by paragraph L that merchandise, which was not actually sold or freely offered for sale *in usual wholesale quantities in the open market of the* country of exportation and which was consigned for sale in the United States or sold for exportation to the United States, should not be appraised at less than the wholesale price at which such or similar imported merchandise is actually sold or freely offered for sale *in usual wholesale quantities* in the United States.

## Section 402 (b) of the Tariff Act of 1922 reads:

SEC. 420. (b) The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

In the case of *United States* v. *International Forwarding Co.*, 13 Ct. Cust. Appls. 579, T.D. 41436, we held that "the prices at which merchandise is sold to a limited number of favored purchasers, or to the retail trade only, *in quantities greater or less than the usual wholesale quantities*, would not be proper evidence" of either foreign or export value, as defined in subsections (b) and (c) of section 402 of the Tariff Act of 1922. (Italics ours.)

In the case of *G. W. Pleissner* v. *United States*, 16 Ct. Cust. Appls. 507, T.D. 43237, this court held that the language "in the usual wholesale quantities," contained in section 402 (b), *supra*, was intended by the Congress "to refer to a major portion of the sales or offers for sale [in wholesale quantities] of the merchandise in question, and that sporadic sales or sales in minor quantities should not be held to

constitute *usual* wholesale quantities." See also *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T.D. 42216; *United States* v. *Proctor & Co.*, 15 Ct. Cust. Appls. 373, T.D. 42564; *United States* v. *D. J. Powers, etc., and Geo. Wm. Rueff, Inc.*, 16 Ct. Cust. Appls. 185, T.D. 42811.

It is clear from the language of section 402 (b), *supra*, and from the authorities hereinbefore referred to, that the Congress *did not contemplate* that there should be *more than one market value or price for* "such or similar" imported merchandise at the same time. A holding to the contrary might, and probably would, result in imported merchandise, identical in character, sold to different purchasers in the principal markets of the country of exportation, exported at the same time, "if subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof" (section 503), being subjected not only to different amounts of duty, but also, in some instances, to different rates of duty, even though the costs of containers, coverings, and other costs, charges, and expenses "incident to placing" such "merchandise in condition, packed ready for shipment to the United States" were the same. However, it does not follow that, because the statute—section 402 (b)—does not contemplate that there may be more than one market value or price for "such or similar" imported merchandise at the same time, the word "quantities," contained in the statutory phrase "in the usual wholesale quantities," should be considered in the singular rather than in the plural. The Congress was undoubtedly aware of the fact that, in the trade and commerce of foreign countries, as well as in our own, merchandise is frequently sold, as evidenced by the record before us, in wholesale quantities ranging anywhere from 1 to 10,000 or more articles. This being so, it is evident that the words "wholesale quantities" were intended to be applied, as used, in the plural, and that to hold that those words should be interpreted to mean wholesale *quantity* would greatly, and, in our opinion, unduly limit the scope of the statutory definition of foreign value.

It is just as evident, however, as was held in the case of *G. W. Pleissner* v. *United States*, *supra*, that the Congress did intend, by the use of the word "usual," to limit the words "wholesale quantities" to such wholesale quantities as were usually, customarily, and ordinarily freely offered for sale to all purchasers in the principal markets of the country of exportation, in the ordinary course of trade, and that the language "in the usual wholesale quantities" was intended "to refer to a major portion of the sales or offers for sale," in wholesale quantities, of imported merchandise, subject, however, to the further limitation hereinbefore indicated that, although the word "quantities" must be applied in the plural, in the sense hereinbefore stated, the statute does not contemplate two or more "usual wholesale quanti-

ties" having two or more market values or prices. On the contrary, the statute does contemplate, we think, but one—*the usual*—having but one "market value" or "price * * * at which such or similar merchandise is freely offered for sale to all purchasers," at the time of exportation to the United States.

If the courts below were correct in holding, as they did, that the affidavit and the manufacturer's price list, disclosing several wholesale quantities—eight in all, each having a different market value or price—without evidence tending to establish which of the eight was the *usual*, was sufficient to establish a foreign value for the merchandise, there would be eight wholesale quantities, having eight different market values or prices, and as many different foreign values for such merchandise, without regard to the costs of containers, coverings, and other costs, charges, and expenses "incident to placing" it in "condition, packed ready for shipment to the United States." Such a situation is, obviously, not contemplated by the statute.

There being no evidence of record to establish, within the principles herein stated, that the "usual wholesale quantities" of the involved merchandise were "10,000 or more," there is no substantial evidence of record to support the judgment of the Appellate Division of the Customs Court, affirming the judgment of the trial court. Accordingly, the judgment is *reversed*, and the cause *remanded* for proceedings consistent with the views herein expressed.

CONCURRING OPINION

BLAND, Judge, specially concurring: I concur in the conclusion that there is no substantial evidence in the record to uphold the decision of the Customs Court that 10,000 or more of the dictionaries involved constituted the usual wholesale quantity of that merchandise in the country of exportation. However, I regard it as most unfortunate for this court in interpreting the term "in the usual wholesale quantities" to employ the arbitrary and unqualified expression " 'to refer to a major portion of the sales or offers for sale', in wholesale quantities."

In order to properly interpret the phrase "in usual wholesale quantities", found in the definitions of value, we must not lose sight of what Congress was seeking to accomplish by the use of the term. The Tariff Act of 1922 contained several different kinds of value to be accepted, under certain circumstances, as the value of the imported merchandise, upon which value ad valorem duties were to be assessed. It provided that the value to be accepted first was either foreign or export value, whichever was the higher, and in defining both foreign and export value it provided that that value should consist of the market value or the price of "such or similar merchandise" at which

it is freely offered "in the usual wholesale quantities" and in the ordinary course of trade (at the time of exportation). In foreign countries, as here, wholesalers very often sell their goods at one price for large quantities and at higher prices for smaller quantities.

It is not reasonable to suppose that it was the intent of Congress that the appraiser should accept as the value of imported merchandise the low and unusual price obtained only by the purchase of enormous quantities. Neither is it to be presumed that he is to accept the very high price made necessary by the very small quantities sold to each customer, the sale involving expensive packaging, etc. Congress intended for the appraiser to adopt as his value the price ordinarily and customarily received under the specific circumstances set out in the paragraph. The problem for the courts, however, becomes a difficult one when attempt is made to lay down or follow a rule as to what kind of evidence is required to show what is the usual wholesale quantity.

I agree with the majority that there cannot be several different "usual wholesale quantities" for appraisement purposes and that there cannot be two market values for the same commodity on the same date. If the appraiser must appraise imported goods at the low selling price of very large quantities and, on the same day, appraise the same kind of goods at higher prices which are occasioned by the smaller quantities sold, an anomalous situation results which Congress could not have intended.

The meaning of the word "usual" when considered by itself, is not difficult to understand, and Congress no doubt used it in its ordinary acceptance, that is to say, it had in mind the ordinary, customary practice in selling such merchandise in the foreign country.

At first blush the problem of determining what kind of proof of the usual wholesale quantities should be required seems to be a simple one. At the threshold of the inquiry, however, numerous perplexing questions are presented. Did Congress mean the usual quantity of the seller of the particular merchandise imported, or the usual quantity of the trade generally? Did it mean the quantities of the sales at the time of exportation or did it mean to refer only to such quantities at the time of importation as by custom or repetition had become the usual quantities? Would proof of the usual quantity of sales by the one shipper at the time of exportation of the shipment be sufficient to meet the requirement? In considering proof of the usual wholesale quantities, what effect shall be given to offers which do not ripen into sales?

The majority have laid down the hard and fast rule that the usual wholesale quantities mean "a major portion of sales or offers of sales" and, presumably, reference is made to the seller of the particular merchandise imported. Let us suppose that a case is presented here

where the record shows nothing more than that the exporter of the particular merchandise imported made 50 sales of 100 pounds each at 75 cents per pound, and also made 50 sales of 50 pounds each at $1 per pound. Have the usual wholesale quantities been established? Not according to the rules laid down by the majority. Although one half of his sales were made in 100-pound quantities and two thirds of his business was done by sales in that quantity, no usual wholesale quantity existed for that manufacturer. If, however, he had made 51 sales in one instance and 49 sales in the other, it would have been different. Or, let us consider 100 sales at 10 pounds each and 99 sales of one thousand pounds each, all at wholesale. The 10-pound quantities would have to be accepted. If the rule laid down is to be followed absolutely, it might result in foreign value being created for the sole purpose of meeting the test. This is especially true if *offers* for sale are to be considered. Suppose the record with reference to usual wholesale quantities showed only that the exporter had, in 500 letters, addressed to every member of the trade in the foreign country, *offered* the merchandise at one price on account of quantity, and that he made a lesser number of *sales* at a slightly lower price for a slightly greater quantity. Under the ruling of the court that the majority of "sales or offers for sale" controlled, what would the appraiser be justified in doing under such circumstances?

Numerous instances can be suggested where merely the preponderance of the number of sales or offers for sale should not be controlling in determining what is the usual wholesale quantity. I think this court should leave the matter open so that in instances where the application of such a rule produced an unconscionable anomaly, an exception to it could be made without destroying it.

It is my judgment that the all-inclusive definition of the majority is also dangerously defective on account of the inclusion of the term "or offers for sale" in the connection in which it is used. I have always had very serious doubt in cases of foreign and export value whether mere offers without any sales could possibly constitute proof of the usual wholesale quantities. Offers for sale, of course, are a highly important consideration, since they go to the question of whether the sales are sold in pursuance to a policy of freely offering and selling to all alike.

I am of the opinion that in most instances the usual wholesale quantity is shown by showing the quantities of the major portions of the sales. Of course, the sales must be made in the usual course of trade, and a freely offered price to all must be shown. As between the major portions of the sales, and the bulk of the business irrespective of the number of the sales, if I were required to arbitrarily choose for the purposes of this case, I would accept the former. It more nearly reflects my view of what in most instances would prove the

"usual" wholesale quantity, but I am not required, under all circumstances, to regard proof of a mere preponderance in such sales as fully probative of the issue.

Moreover, I doubt very much if in many instances this court is justified in finding the usual wholesale quantities by a consideration only of the sales or offers (especially offers) of the exporter of the merchandise involved. In order to do so, of course it must be presumed, in the absence of anything to the contrary, that what he does is what others do. If there are no others, the record should so state. If there are others, their practice should be shown to be substantially the same or else the appraiser may be required to accept as the value of the imported goods a price which is wholly out of range with the usual course of trade generally in the country of exportation. Instead of saying that the usual wholesale quantity "refers to a major portion of the sales or offers for sale", as the majority have said, I would say that this was ordinarily true. In instances where it was obvious that the majority of sales of one exporter (and this is most often the only showing in the record) did not show what the usual quantities for wholesale were generally, in the foreign country, I would reject such proof as failing to show foreign or export value.

It may be suggested that the parties to a customs appraisement litigation may have a witness swear that a certain quantity is the usual wholesale quantity. Unless the evidence disclosed the facts upon which he based his conclusion, it would have no probative force. He might regard the usual quantity as *his* usual quantity or the quantity at which most of his output was disposed of or he might have one of many other theories of what constituted *usual* wholesale quantity.

I agree with the majority that this record does not show any usual wholesale quantities within the meaning of the statutory provision in controversy, and, therefore, concur in the conclusion reached.