UNITED STATES v. PROCTOR & Co. (HAMMACHER-SCHLEMMER & Co.,
(No. 2922) [1]

[1] T. D. 42564.

United States Court of Customs Appeals, January 23, 1928

*Charles D. Lawrence*, Assistant Attorney General (*Oscar Igstaedter* and *John F. Kavanagh*, special attorneys, of counsel), for the United States.
*Irving D. Lipkowitz* for appellee.

[Oral argument October 4, 1927, by Mr. Igstaedter and Mr. Lipkowitz]

Before GRAHAM, Presiding Judge, and SMITH, BLAND, and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This case is an appeal by the Government from a judgment of the United States Customs Court, First Division, which affirmed the reappraised values found by Associate Justice Fischer in reappraisements Nos. 51076–A and 51165–A. The reappraisement decisions of the associate justice found values different from either the entered value or the value found by the appraiser. On review by division 1 of the court below Justice Brown wrote the opinion of the court, the result of which was concurred in by Justice Sullivan. Justice McClelland dissented. The decision of the court below is in the following language:

This case involves solely a question of fact. After a careful examination of the record, we conclude that the findings made by the justice below are correct. We find as facts herein that the foreign-market values of the goods in question at the respective dates of shipment (no export value being higher) are the figures found by Justice Fischer. The reappraised values are therefore affirmed.

Both appellant and appellees agree that the court below found foreign-market value (sec: 402 (b), Title IV, Tariff Act of 1922) and that there is no export value (id. (c)) for the merchandise in question.

The only question involved in this appeal, it being an appeal from re-reappraisement, is conceded to be, Is there any substantial evidence to sustain the judgment and finding of the court below?

The merchandise involved consists of tuning pins and zither pins, imported from Germany in the months of February and June in the year 1925. The pins are of steel and the illustrative exhibits show them to be something over 2 inches in length, probably a quarter of an inch in diameter, and apparently made from round steel bars or wire, flattened on four sides at one end to fit a key and somewhat pointed at the other, the pointed end being threaded. Near the flattened end is a hole entirely through the pin for the purpose of the insertion of the piano wire or zither wire.

The record is a very confusing one. The importers, before the single justice, apparently attempted to prove that there was no home market value for the merchandise in so far as zither and piano pins used in Germany were ordinarily of different sizes from those used in this country; that the threads of the pins used in Germany were made by hand with a rasp, while the threads of the imported merchandise were made by an automatic threading machine; and that the pins used in Germany were lacquered and some of them were bright on the ends, while those sent to America were blue.

The goods were entered and invoiced at the price paid by the American importers, which the Government contends is not their foreign value and which was much lower by reason of large discounts due to quantity purchased than certain sales in Germany for home consumption, which the Government contends represents the home market value of the merchandise. Before this court, however, the importers argue that the single justice found foreign market value and that the proof offered by importers abundantly sustains such finding of value.

Justice Sullivan concurred in the conclusion reached in the ruling opinion by Justice Brown, and stated, in part, as follows:

The twenty-fourth assignment of error relates to the quantity purchased, being 500,000, and it is claimed this quantity is large and influenced the price. I think that is correct. It did influence the price. The fact is stated by the affidavit of the seller that anyone in Germany or anywhere else would obtain the same price for like quantities. That being true, it destroys the effect of a higher price for a less quantity.

On the whole record I feel satisfied the court below arrived at the correct value of the merchandise, and I therefore concur in the conclusion reached by Judge Brown.

It is clear that the court did find, or attempted to find, the foreign-market value, and in doing so, among other allowances, allowed a 30 per centum discount which was allowed only upon sales of over 5,000,000 pins during a half year. Certain facts are conceded, among them being the fact that the manufacturers of this character of goods in Germany belonged to an organization or "bund" and that the price for home consumption was controlled by it, but that there was no attempt to control prices for export; that there were five firms, including the manufacturer of the goods in controversy, in Germany who made this character of merchandise, but that W. Wagner, jr., who manufactured the tuning pins in question, was the only manufacturer who exported to the United States; and that he sold 60 per cent of his entire output to Hammacher, Schlemmer & Co., the American importers, who are the only American purchasers of such goods.

The appraisement of the goods involved the allowance of discount as follows:

For sale of one design within a half year's time:

| | | |
|---|---|---|
| 1,000–2,000 mille | 5% | consumption discount. |
| 2,000–3,000 mille | 10% | consumption discount. |
| 3,000–5,000 mille | 20% | consumption discount. |
| Over 5,000 mille | 30% | consumption discount. |

It is admitted that no sale in Germany in the half-year period had reached the quantity entitling the purchaser to the 30 per centum discount. There is a statement in the record to the effect that any-one in Germany or elsewhere who purchased in the quantities indicated by the price list would be privileged to obtain and would obtain the discount indicated.

The sworn affidavit of Alfred Walle, a representative of W. Wagner, Jr., produced by the importers, no doubt for the purpose of showing that there was no foreign market for home consumption for the goods in question, shows, in part, as follows:

I am the proprietor of the firm of W. Wagner, Jr., and maintain a factory for the manufacture, among other products, of tuning pins at Plettenberg, Cologne, Germany.

During the months of March, April, May, June, and July of this year I exported to Hammacher, Schlemmer & Co. (Inc.), of 133 Fourth Avenue, New York City, eight shipments of tuning pins, which, I am informed, are now before the appraiser of the port of New York for appraisement. I am making this affidavit for the purpose of setting forth certain facts which should be of assistance to the appraiser in appraising the said shipments.

For about fifty years Hammacher, Schlemmer & Co. (Inc.), has had the sole agency in the United States of our tuning pins. For many years and at all of the times in question Hammacher, Schlemmer & Co. (Inc.), has purchased about sixty per cent (60%) of the entire output of our factory.

There is not a single jobber or dealer in all of Germany who purchases tuning pins in the large quantities in which Hammacher, Schlemmer & Co. (Inc.), does, the purchases of German jobbers and dealers being in comparatively limited quantities. Hammacher, Schlemmer & Co. (Inc.), in the course of a single year purchases and imports from us in excess of six million tuning pins, whereas the jobbers in Germany usually purchase not more than sixty thousand, so that the proportion is in the ratio of about one thousand to ten.

Aside from the question of the limited quantities in which tuning pins are purchased in the German market there are other considerations of importance.

The tuning pins which we manufacture for use in Germany are quite dissimilar from those intended for exportation to the United States. For example, the pins exported to the United States are almost exclusively blued, while in Germany the pins are used chiefly with white thread and white point, and in addition many other styles and finishes are used, viz, bright, lacquered and tinned, with machined and filed thread. Moreover, the German market uses many sizes of pins in small and limited quantities, while Hammacher, Schlemmer & Co. (Inc.), purchases tremendous quantities in but very few sizes.

In consequence of these facts we are required to maintain a stock of at least fifty to sixty sizes of German pins, which results in an overhead on such sales of at least 50% more than on the pins manufactured for export to the United States.

While the pins imported by Hammacher, Schlemmer & Co. (Inc.), are of the same general appearance as those used in Germany, they are in fact, as to the process of manufacture, entirely different. The pins used by Hammacher, Schlemmer & Co. (Inc.), are threaded by automatic machines, whereas the pins used by jobbers and dealers in Germany are threaded often by hand. The difference in the cost of these operations is of course obvious, and accounts, together with the other facts set forth in this affidavit, for any difference in price that may exist between the German pins and those imported by Hammacher, Schlemmer & Co. (Inc.). The thickness and length of the pins used in Germany are also different from those exported to the United States. At the present time ours is the only factory in Germany which manufactures tuning pins for export to the United States, and Hammacher, Schlemmer & Co. (Inc.) purchases about sixty per cent (60%) of our entire output.

The prices at which we sell our tuning pins to Hammacher, Schlemmer & Co. (Inc.), are exactly the same as those we would quote to any dealer in any part of the world who purchased in the same quantities as Hammacher, Schlemmer & Co. (Inc.), does.

The invoices in the case at bar show a purchase by Hammacher, Schlemmer & Co. (Inc.), of 215,000 pieces in one instance and 750,000 pieces in another. No such sales in this quantity were shown to have been made for home consumption in Germany, nor to any other person at any other time. The affidavit of Walle definitely shows that a 30 per cent discount was never obtained by anyone in the home market and the affidavit furthermore shows that, under the peculiar facts of the case, there was no reasonable probability of anyone in Germany ever receiving such a discount.

Exhibit II, introduced by importers, shows that 20 per centum is added to the price, if the order is less than 5,000 pieces, and if it is over 5,000 pieces and less than 10,000 pieces, 10 per centum is added.

It is difficult for us to understand how the court below found a foreign market value which was arrived at after deducting the 30 per centum discount, which discount was only obtainable where more than 5,000,000 pieces were purchased. Can a foreign market value, as defined by the statute, be established by one or more sales for export to one individual who is the sole agent and whose purchase price is determined by the quantity purchased? The facts in this case show a 30 per centum discount was allowed for sales for export which aggregated a certain amount during the period of a half year. If there were other importers of this article whose aggregate sales did not reach the point where the 30 per centum deduction was applicable, the appraiser at the port of entry would necessarily have one value for one man's goods and another value for another man's goods, both purchased in the same market, of the same individual, and on the same date. Surely the home market value for home consumption on the date of exportation could not be two different prices which are established by two different sales made not for home consumption but for consumption in the United States. And we do not think that proof consisting of a statement by the seller that anyone in

Germany could have the discount if he bought over five million in a half year, and a printed price list for sales in Germany showing such discount changes the situation at all, especially when it is admitted that no one in Germany has made such purchases nor will anyone be likely to do so. *United States* v. *Traders Paper Co. et al.*, 14 Ct. Cust. Appls. 293, 50 Treas. Dec. 541, T. D. 41909.

From the statement in Justice Sullivan's opinion it is clear that he regarded a foreign market value established by the statement in the affidavit of the seller that anyone in Germany or anywhere else would obtain the same price for like quantities. We do not think this establishes the foreign market value, especially if it is contended that the evidence supporting the foreign market value is proved in this record by sales not for home consumption.

There is no substantial evidence in this record to justify a finding contrary to the fact that the 30 per centum discount has never been allowed to any purchaser of this character of goods, except in the instant case, and it can not be disputed that it was allowed here only because of the enormous quantity purchased. We are led to inquire at once, what was the usual wholesale quantity in the foreign market for home consumption? It certainly was not 5,000,000 or more pieces. The value found by Associate Justice Fischer was based upon this quantity and was, therefore, incorrect. *United States* v. *Andrews & Co.*, 15 Ct. Cust. Appls. 126, T. D. 42193.

It follows the judgment of the court below must be reversed and the cause remanded for further action not inconsistent with the views herein expressed.

*Reversed* and *remanded.*

BARBER, J., did not participate in this decision.