(A. R. D. 24)

UNITED STATES *v.* S. S. KRESGE CO.

Entry No. 816484, etc.

Third Division, Appellate Term

(Decided May 19, 1953)

*Charles J. Wagner,* Acting Assistant Attorney General (*Daniel I. Auster,* special attorney), for the appellant.
*Sharretts, Paley & Carter* (*Howard C. Carter* and *Joseph F. Donohue* of counsel) for the appellee.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: This application for review by the Government of the decision and judgment of the trial court (Reap. Dec. 8127) was filed against the value found for the celluloid-covered thumb tacks, 50 pieces mounted on each board, by reason of the holding that the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for determining the value of the merchandise, and that such export value, which was the purchase price, was not less than the foreign market value, and that, consequently, the Antidumping Act of 1921 does not apply, contrary to the finding of the appraiser.

The Government contends that plaintiff's exhibit 1 merits no probative weight and fails to overcome the presumption attaching to the appraiser's action; also, that the evidence of the Government fully supports a finding that the purchase price, under section 203 of the Antidumping Act of 1921 (19 U. S. C. § 162), is less than the foreign market value under section 205 of said act. Consequently, special dumping duties, under the provisions of section 202 (a) of said Antidumping Act, are just and proper. Counsel for the Government

stresses the fact that Government's exhibit 2 evidences an inland price list of the exporter which shows prices for celluloid-covered thumb tacks on cardboards with 50 tacks, single colored or striped, for size 2, the size here in question, at RM 93 per 1,000 cardboards; that page 6 of Government's exhibit 4 contains the exporter's price list showing inland sales, and particularly that the several thumb tacks illustrated fall under the following association groups:

\* \* \* Group VI "Cello" celluloid-covered head, also lacquered-head, one color or striped.

The Government insists that the evidence in these exhibits supports the findings of the appraiser that the purchase price is lower than the foreign market value, particularly for the reason that the exporter had published a price list, effective April 1, 1936, for inland or home consumption sales which included the celluloid-covered thumb tacks on cardboards with 50 tacks, and contends that such price list establishes that the tacks in question were, for that reason, freely offered for sale; that Government's exhibit 5 discloses that the association price list, effective April 1, 1936, remained unchanged in 1938, thus establishing that the prices and terms were in effect on the dates of purchase as well as the dates of exportation of the thumb tacks here in question. From such exhibits, counsel for the Government contended that the foreign value was RM 93 per 1,000 boards, less 33⅓ per centum trade discount, less 3 per centum cash discount, which, according to his calculations, would equal RM 60.14 per 1,000 boards, and which, when reduced to the price per gross boards of 50, is RM 8.6602. Respecting the goods covered by reappraisement 125792-A, the purchase price was calculated as RM 8.5510. In view of such findings, counsel for the Government sought to establish that the dumping duties were properly applicable, the home market selling price being greater than the purchase price herein. Counsel for the Government admits, however, that the statutory purchase price, as calculated, would vary with each of the shipments herein.

The Government does not dispute the fact that the actual purchase price is RM 8.85, less 3 per centum per gross boards, but contends that such price does not represent the statutory purchase price under the provisions of section 203 of the Antidumping Act, because, under that act, in order to obtain the required statutory price more than the invoice purchase price and the discount must be considered. In other words, the Antidumping Act not only provides for sales in the home market, but for sales and offers for sale to countries other than the United States as representative of a foreign market value thereunder.

The Government urges that no probative weight should be accorded to plaintiff's exhibit 1 by the court, not only because it was obtained many years after the transactions in question were consummated, but

also because under *Brooks Paper Company* v. *United States*, 40 C. C. P. A. (Customs) 38, C. A. D. 495, a statement appearing in the affidavit that the vast majority of sales at wholesale for export to the United States and to other countries were in quantities of 1,000 gross boards or more, falls short of establishing the usual wholesale quantity. In that respect, the case of *Sears, Roebuck & Co.* v. *United States*, 31 C. C. P. A. (Customs) 36, C. A. D. 246, was also cited.

The provisions of the Antidumping Act of 1921, so far as applicable, provide:

### DUMPING INVESTIGATION.

SEC. 201. (a) That whenever the Secretary of the Treasury (hereinafter in this Act called the "Secretary"), after such investigation as he deems necessary, finds that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation into the United States of a class or kind of foreign merchandise, and that merchandise of such class or kind is being sold or is likely to be sold in the United States or elsewhere at less than its fair value, then he shall make such finding public to the extent he deems necessary, together with a description of the class or kind of merchandise to which it applies in such detail as may be necessary for the guidance of the appraising officers.

### SPECIAL DUMPING DUTY.

SEC. 202. (a) That in the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary has made public a finding as provided in section 201, and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the cost of production) there shall be levied, collected, and paid, in addition to the duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

### PURCHASE PRICE.

SEC. 203. That for the purposes of this title, the purchase price of imported merchandise shall be the price at which such merchandise has been purchased or agreed to be purchased, prior to the time of exportation, by the person by whom or for whose account the merchandise is imported, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, less the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States; and plus the amount, if not included in such price, of any export tax imposed by the country of exportation on the exportation of the merchandise to the United States; and plus the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States; and plus the amount of any taxes imposed in the country of exportation upon the manufacturer, producer, or seller, in respect to the manufacture, production or sale of the merchandise, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

FOREIGN MARKET VALUE.

Sec. 205. That for the purposes of this title the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

The evidence submitted by the plaintiff consists of two affidavits. The affiant in each affidavit was Erich Karrenberg, the general manager of Hansa-Werk Ernst Berning, formerly the firm of Gust. Rafflenbeul, of which he was also general manager. These affidavits were admitted in evidence as exhibits 1 and 7, the latter exhibit being introduced for the purpose of correction of the inadvertent use of the word "cellophane" when the word "celluloid" was intended in referring to celluloid-covered heads of the thumb tacks in question. The court below set out the first affidavit in full in its decision which we do not deem necessary here. It appears that the affiant was one of the personnel of the manufacturer, Rafflenbeul, who was interviewed by the Treasury attachés and representatives in obtaining the information contained in the various reports.

In his affidavit, exhibit 1, Erich Karrenberg makes a clear and concise statement of the facts, which, in substance, discloses that steel wire thumb tacks with cellophane-covered heads were never at any time sold in Germany for home consumption; that they were freely offered for sale at all times in the usual course of trade to all purchasers for exportation to the United States and other countries; that the principal markets of Germany where such thumb tacks were sold for exportation to the United States and other countries were Sonneberg, Berlin, and Hamburg; that the vast majority of sales at wholesale of such thumb tacks for exportation to the United States and to other countries were in quantities of a thousand gross boards and more; that the price at which said thumb tacks were freely offered for sale, and were sold to all purchasers for exportation to the United States and to other countries in quantities of thousand gross boards and more in Sonneberg, Berlin, and Hamburg, in the usual course of trade, was RM 8.85 per gross boards, less 3 per centum, packing included; that such price was, in fact, the actual price paid; and, further, that

the cost of production of such tacks was less than RM 8.85 per gross boards, less 3 per centum, packing included.

Inasmuch as counsel for the Government contends that the Government's exhibits fully support a finding that the purchase price, under the provisions of section 203, *supra*, is less than the foreign market value, under section 205, *supra*, and that the special dumping duties, under section 202 (a), *supra*, were properly assessed, we think it advisable to set out the Government's evidence in more detail than appearing in the opinion of the trial court.

The Government's exhibit 2, consisting of a Treasury representative's report of an investigation, dated December 30, 1937, concerned an inquiry relative to the "Gura and Rodi tack" which was sold by the box, and whether or not there were discounts allowed in the home market of 33⅓ per centum and 3 per centum to purchasers in large quantities. The Treasury representative reported that there was an association inland price list, dated April 1, 1936, which must be adhered to by all members of the association of thumb tack manufacturers when selling in Germany. He also pointed out that the inland freight was a part of the price in the home market. The discount to large buyers were as large as 33⅓ per centum. To small buyers, the discount was 15 per centum.

Attached to this report is a price list having thereon the prices of celluloid-covered tacks, 50 tacks, single or colored, on cardboards, size 2. These tacks were listed at a price of RM 93 per 1,000. There was also attached thereto another price list, which was marked "New Price – List for Messrs. Robert E. Miller Inc.," quoting thumb tacks on wooden boards of 50, celluloid covered, at the net price of RM 50 per 1,000 boxes of boards. These tacks apparently were not the same as the celluloid-covered thumb tacks at issue herein. The Treasury representative also significantly stated that *although there were many inland sales in Germany, none were sales for celluloid-covered thumb tacks on cardboards containing 50 tacks.*

The Government's exhibit 3 is a Treasury representative's report of an investigation, dated July 20, 1936, concerning solid head thumb tacks only and has no relation to the particular tacks here at issue.

The Government's exhibit 4 is a Treasury attaché's report, dated April 28, 1937, of an interview with Dr. Karrenberg, the affiant herein, and his assistant, Herr Pfaffenbach. The report was made as the result of an inspection of the firm's records which had been placed at the disposal of the Treasury attaché. The attaché stated that he was told that all thumb tack manufacturers in Germany were obliged to belong to the Association of German Thumb Tack Manufacturers and obligated themselves to sell only at association prices, whether for inland or export sale, and that the association issued both an export and an inland price list, with copies available only to members. The

attaché copied data from such lists which were made available to him. The export price list was issued by the association on July 24, 1936, with corrections up to the date of examination, and the inland price list became effective as of April 1, 1936. The principal items exported to the United States included "Celluloid covered thumb tacks in slide boxes of 36, 75 and 100 pieces, or on boards of 50 each," and the price of celluloid-covered thumb tacks, group VI, size No. 2, per 1,000 boards of 50 "U. S. A." (new list), was RM 60. The price for German exporters was quoted at RM 108 and that of German inland RM 93. The terms and conditions for "U. S. A." were "F. o. b. German seaport, 3% cash discount." A new price list was reported as made effective August 27, 1936, and is "based upon free Reichmark payment." For German exporters, the prices were for delivery, f. o. b. German seaport. The usual discount was 33⅓ per centum plus 20 per centum with the exporter given the right to claim an export subsidy. For German inland sales, the delivery charges were included in the price, that is, the freight was paid to the buyer's stations anywhere in Germany, packing included, with no reduction for delivery taken at the factory. The discount was 33⅓ per centum to wholesalers and large buyers. A discount of 15 per centum was granted to small buyers. However, the Treasury attaché observed that this manufacturer did not sell to small buyers. In addition, there was a cash discount of 3 per centum for prompt payment or 2 per centum for 30 days. The various types of thumb tacks on the manufacturer's price leaflet showing the German inland prices for the various types of thumb tacks ordinarily in demand in the home market, which was attached to the exhibit, were checked by the Treasury attaché against the association price list and found to be in agreement. *There were no prices upon this inland price list for celluloid-covered head thumb tacks such as are in question herein.*

The Government's exhibit 5 is a Treasury representative's report, dated September 29, 1938, upon celluloid-covered thumb tacks referred to in exhibit 2. An inquiry was made to determine if the price lists were effective and if the cost of production figures would apply subsequent to July 1936. The report disclosed that the price list remained unchanged since December 30, 1937, and there was no substantial change in the production costs. The report also included copies of sales made in the home market, nine of which were for celluloid-covered head thumb tacks. However, the packing was entirely different, that is, the thumb tacks were not on boards of 50 each.

The Government's exhibit 6 is a report of an assistant Treasury attaché, dated March 22, 1935. This report was the result of an investigation undertaken to ascertain the prices at which Gust. Rafflenbeul G. m. b. H. sold thumb tacks in the foreign market and the cost of production of those numbers which are sold neither for home consumption nor for exportation to countries other than the United States.

The writer of the report obtained his information from Erich Pfaffenbach, the export manager, and an inspection of the books and records of the firm. Karl Jacobi, the cost accountant, also furnished him with the records pertaining to the cost of production.

He reported that the inspection of the books disclosed that the celluloid tacks on boards of 50 were sold to Woolworth and also that minor quantities were sold in Holland. This report also disclosed that the manufacturers' association of thumb tack manufacturers had ceased to function since the beginning of 1935 and the association price list was no longer observed, which fact had resulted in a considerable reduction in prices since that time. The statement in this report seems to be at variance with the reports of the other Treasury representatives. For that reason, it is quoted as follows:

### FOREIGN MARKET VALUES

*Manufacturers' Association.* The association of thumb tack manufacturers, which was previously reported upon, was still functioning during the year 1934. *However, since the beginning of January, 1935, the association has ceased to function, and the association price list is no longer observed. This has resulted in a considerable reduction of prices since that time.* [Italics not quoted.]

The report also observed that deliveries of merchandise sold in the home market were made freight prepaid to the buyer's nearest railway station, with no allowance for delivery at the factory. The report also contains the statement that celluloid tacks, assorted colors, on boards of 50, were sold to Woolworth & Co. and to the American Merchandise Co. in 1934, but that they were not sold in Germany for home consumption, although the association inland price list provided a price of RM 108 per 1,000 boards, subject to discounts previously shown.

The attaché also reported that he found a few sales had been made in minor quantities for exportation to countries other than the United States; that there was a sale to Gutmann & Lemle, Nuernberg, in October 1934 of 432 boards at RM 60 per 1,000, less 2 per centum for cash, and three sales to Holland buyers in quantities of 1,800, 1,000, and 1,000 boards, respectively. These sales were made one to Rotterdam, f. o. b., duty included, and two to Amsterdam, f. o. b., duty included. The cost of production was tabulated in this report "for those numbers as to which no foreign market value exists." Significantly, the summary of the cost of production included "Cello" assorted colors, boards of 50, which refers to the celluloid tacks. The total price, including material, labor, general expenses, containers, and profit, is listed as RM 47 per 1,000 boards. This figure per gross boards equals RM 6.77.

It would thus appear that the evidence submitted by the importer is fully substantiated by the Government's reports. First, the reports substantiate the statement that the thumb tacks in question

were not sold in the markets of Germany for home consumption; second, that the manufacturer's association had ceased to function; third, that the cost of production was lower than the selling prices noted in the invoice; and, fourth, that the usual wholesale quantities in which the exporter sold the merchandise were in lots of 1,000 boards or more.

True, there is nothing in the Government's reports to substantiate the price paid by the importer for the . thumb tacks in question. Then, again, there is nothing in the reports to refute that the price paid was not the export value. As a matter of fact, had the Treasury representatives been able to find sales of these particular thumb tacks to American buyers or to buyers in the home market, it is presumed that such sales would have been reported along with the other sales.

It is the contention of Government counsel that a price list which is in effect is sufficient evidence of the foreign value, even though no sales were made thereunder. To support such view, counsel for the Government cites the cases of *United States* v. *Baldwin Universal Co.*, 18 C. C. P. A. (Customs) 394, T. D. 44641, and *Robinson & Co. et al.* v. *United States*, 13 Ct. Cust. Appls. 644, T.. D. 41486. In the *Robinson* case, the court stated that:

* * * The orders and acceptances in this case were something more than mere offers to sell. They were binding agreements to *buy* and *sell* and were therefore just as dependable as actual sales for the purpose of ascertaining values. [Italics quoted.]

In the *Baldwin* case, *supra*, the court had before it several price lists involving merchandise sold for home consumption as well as for export. Sales were made under these price lists at various times except the last one. The appraiser advanced the goods to agree with the latest price list, although, since its issuance, no deliveries had been made. The importer claimed that it was not yet effective, there being no deliveries. The Customs Court sustained that view and refused to consider the latter price list. The appellate court, in reversing this court, stated:

* * * It is perfectly true that in any given case the facts may be such as to require evidence of sales under a price list, in order to establish such price list as effective, but we cannot hold, as a matter of law, that in all cases there must be sales at the prices named in a price list, and that it is not effective prior to the date of such sales. This the lower court did, as we construe its decision, and we think this constitutes reversible error. In the case at bar, had the importer admitted that Exhibit 2 was in effect from its date, April 15, 1926, certainly sales would not have been required to establish that fact. We repeat that, in our view, the court might have found that under the facts in evidence it would not regard the price list, Exhibit 2, as effective prior to the first sale shown under it. It would then have weighed all the evidence, including the evidentiary value of the price list.

In that case, the appellate court distinguished the case of *United States* v. *Proctor & Co.*, 15 Ct. Cust. Appls. 373, T. D. 42564, where the situation was somewhat similar to the case at bar, as far as there being a notation of such items upon an inland price list. In the *Proctor* case, the court stated:

* * * And we do not think that proof consisting of a statement by the seller that anyone in Germany could have the discount if he bought over five million in a half year, and a printed price list for sales in Germany showing such discount changes the situation at all, especially when it is admitted that no one in Germany has made such purchases nor will anyone be likely to do so. * * *

In the *Baldwin* case, *supra*, the court observed as to the foregoing case as follows:

It will be noted from this statement of the court that the admission was not only that no sales had been made in Germany in lots of over five million in a half-year at the prices in the printed price list referred to, but that no sales had been made at all at any prices in such quantities. In the case at bar, *if there had been evidence that there were no sales in France of merchandise of the character here involved at any prices in the usual wholesale quantities, then the decision of this court in United States* v. *Proctor Co., supra, would be applicable*; * * * [Italics not quoted.]

It is apparent that the foregoing cases do not sustain the Government's contention. As to Government's further contention that the affidavit of the exporter's representative should be given no probative weight under authority of the *Brooks Paper Co.* case, *supra*, and *Sears, Roebuck & Co.* case, *supra*, we find that the *Sears* case is not in point, and the *Brooks Paper* case inapplicable. In the latter case, the court did not go so far as to hold that an affidavit unsupported by other evidence such as sales merits no probative weight. Under the circumstances present in that case, the appellate court held the unsupported statement of an ultimate fact, not an evidentiary fact, had no probative weight. That is fully explained in the case of *United States* v. *Fisher Scientific Company*, 40 C. C. P. A. (Customs) 164, C. A. D. 513, where the facts stated in an affidavit were given probative weight, and the appellate court distinguished the *Brooks* case, stating:

* * * a bare statement in an affidavit introduced by the importer that "the great majority of sales were in quantities of 15,000 square meters or more." * * * was no more than affiant's own unsupported conclusion of an ultimate issuable fact—namely, the usual wholesale quantities—and hence was not substantial evidence of the same.

In the case before us, the reports of the Treasury representatives fully substantiate that the usual wholesale quantity in which thumb tacks were sold was 1,000 gross boards or more.

After a careful review of the evidence presented in this case, it is the opinion of this court that the evidence fully establishes that the purchase price, as defined in section 203 of the Antidumping Act, is not less than the statutory foreign market value, as defined in section 205 of said act, and that the purchase price is not less than the cost of pro-

duction, as defined in section 206 of the Antidumping Act. Consequently, there is no legal foundation for the assessment of an antidumping duty in this case. We, therefore, find as facts:

1. That the merchandise consists of steel wire thumb tacks with celluloid covered heads, 50 pieces mounted on each board, exported from Germany in the year 1938;

2. That such merchandise was not offered for sale nor sold in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade for home consumption;

3. That during the year 1938, such merchandise was freely offered for sale in the usual course of trade to all purchasers for exportation to the United States and to other countries;

4. That the principal markets of Germany for the sale of such merchandise for exportation to the United States and to other countries were Sonneberg, Berlin, and Hamburg;

5. That the usual wholesale quantity in which such merchandise was sold at wholesale was 1,000 gross boards and more;

6. That at the time of purchase and on the dates of exportation, such merchandise was freely offered for sale and was sold to all purchasers in the principal markets of Germany, in the usual wholesale quantities and in the ordinary course of trade, not only for exportation to the United States but to other countries as well, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, at RM 8.85, less 3 per centum per gross boards;

7. That the price of RM 8.85, less 3 per centum per gross boards, was the actual price paid by the importer herein and was the amount received by the manufacturer;

8. That the purchase price, as defined in section 203, Antidumping Act of 1921, *supra*, is the same as the foreign market value on the date of purchase, as defined in section 205, *supra*.

Therefore, as a matter of law, it is the conclusion of this court:

1. That export value, as defined in section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d) is the proper basis for the appraisement of the steel wire thumb tacks with celluloid-covered heads, 50 pieces mounted on each board; that said value is RM 8.85, less 3 per centum per gross boards; and that there is no higher foreign value.

2. That the purchase price, as defined in section 203 of the Antidumping Act of 1921 (19 U. S. C. § 162), is equal to the foreign market value on the date of purchase, as defined in section 205, *supra* (19 U. S. C. § 164).

Judgment will therefore be entered affirming the judgment of the trial court.